**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**HATTIESBURG DIVISION**

**MICHAEL JONES, Individually and as**
**personal representative of the wrongful death**
**beneficiaries of Roosevelt Lee Peavy, Deceased**                              **PLAINTIFF**

**V.**                                                      **CIVIL ACTION NO. 2:10-CV-94-KS-MTP**

**MARION COUNTY, MISSISSIPPI, et al.**                                  **DEFENDANTS**


## MEMORANDUM OPINION AND ORDER

This case involves Section 1983 claims for alleged constitutional violations stemming from the suicide of a man detained prior to a commitment hearing. Presently before the Court is the individual Defendants' Motion for Qualified Immunity [20]. For the reasons stated below, the motion is granted. Accordingly, the Court lifts the stay on this matter and orders counsel for both parties to contact the Magistrate Judge within three (3) days of the entry of this order for purposes of scheduling a Case Management Conference.

## I. BACKGROUND

### A.    *Sequence of Events*

Roosevelt Peavy was taken into custody on February 7, 2009, and held at the Marion County Holding Facility ("MCHF") pending a commitment hearing. Peavy had a history of schizophrenia. While Peavy was there, he sustained a seven centimeter laceration on the back of his head. Upon admission to Marion General Hospital ("MGH") on February 8, 2009, he reported to the hospital

staff that he had slipped and fallen.[1] The doctor who treated Peavy noted that he was "alert and oriented to person, place and time." Peavy denied any headache or pain. Accordingly, the hospital staff gave him five milligrams of Haldol and two milligrams of Ativan, cleaned his wound, stapled it shut, and discharged him. Peavy was then taken to MWCF.

Upon Peavy's arrival at MWCF at approximately 12:30 p.m. on February 8, 2009, a nurse named Stogner examined him. According to her notes, the bandage on his head was dry and intact. Peavy told Nurse Stogner that he was not delusional, but he also told her: "They are trying to kill me. Just call Obama, and he will get me out of here." Sheriff Berkley Hall – a Defendant in this case – ordered that Peavy be placed in a suicide cell, where he would be monitored continuously through a closed circuit video feed and physically observed every fifteen minutes.

Peavy was quiet through the night. He exhibited no harmful or suicidal behavior. However, on February 9, at approximately 10:00 a.m., Peavy began hitting the wall with his fists. At 10:26 a.m., Jailor Jeremy McElroy and Sergeant Stephen Speights – both Defendants in this matter – checked the close circuit camera feed after one of the camera operators told them that Peavy was doing something near the door. He was hitting his head against the wall. McElroy and Speights ran down to Peavy's cell and ordered him to stop, but he did not comply. He appeared to be bleeding from his head. They called a "Code Blue" – a medical emergency – over the radio before they

---

[1]Plaintiff argues that the Court should assume that Mr. Peavy's first injury was the result of self-harm, rather than a slip-and-fall. The only evidence to support this conclusion is Sheriff Hall's brief testimony regarding what he was told prior to Peavy arriving at the Marion-Walthall Correctional Facility ("MWCF") on February 8, 2009. Sheriff Hall testified that he could not recall whether he was contacted by staff at MCHF prior to Mr. Peavy's first trip to MGH for medical attention "from supposedly falling or a self inflicted wound." At best, this testimony is murky, and the hospital records clearly indicate that Peavy reported that he had slipped and fallen. Indeed, the physician's notes from Peavy's first visit to MGH contain no mention of suicidal impulses or self-harm.

entered his cell. Several other officers responded, including Warden Chuck Abrams – a Defendant in this matter – and nursing staff.

Peavy was agitated – pacing and ramming his head into the door repeatedly. Just before they entered his cell, he ran into the door and fell to the ground. Officers entered the cell, restrained him with handcuffs, and placed him on the floor. The staples on his prior wound were bleeding, but they appeared intact. Peavy had suffered another head wound on the crown of his head, and there was urine on the floor. He told the officers that he wanted to kill himself, and, when questioned about his morning medications, he responded that Jesus had healed him. Nurse Sherry Pendarvis applied gauze and tape to the new laceration and advised that Peavy be taken to the hospital. Accordingly, Peavy was transported back to MGH.

At approximately 11:03 a.m., Peavy was admitted to MGH. Dr. Mark Stevens, the treating physician, noted that Peavy suffered from paranoid schizophrenia. Peavy told Stevens that voices told him to beat his head against the wall, but Peavy was alert and cooperative. Dr. Stevens observed the previously described seven centimeter stapled laceration and a three centimeter laceration – also stapled – from which a new three to four centimeter laceration extended.[2] Hospital staff cleaned the new wound, stapled it, and administered a dose of Risperdal. Dr. Stevens noted that long-acting Haldol would have been administered, but the hospital did not have any. Another physician, Thomas Cole, noted that there was no evidence of a skull fracture. Peavy was discharged with instructions for the MWCF nursing staff to administer Haldol as needed later in the afternoon.

---

[2]The hospital records from Peavy's first visit to MGH indicate that he had a single seven centimeter head wound. However, the hospital records from the second visit indicate that he had two previously treated wounds – a seven centimeter laceration and a three centimeter laceration – in addition to a new laceration extending from the smaller of the two previous ones.

Peavy arrived back at MWCF at approximately 1:24 p.m., and Nurse Pendarvis ordered the Haldol from the pharmacy. Pendarvis noted that Peavy was calm as officers cleared his cell, and that he told them he was okay.

At approximately 4:26 p.m., Defendants McElroy and Speights were monitoring Peavy through the closed circuit camera feed and observed him ramming his head into the door and wall of his cell. They both ran to his cell. When they arrived there, Peavy was on the floor, bleeding from his head. He stood, and Defendants McElroy and Speights ordered him to stop running into the wall. Before they could enter the cell, he again ran head-first into the wall and fell to the floor. After they entered the cell, they initiated a Code Blue, and several other officers arrived on the scene, including Defendants Chuck Abrams and Derrick Mingo.

The officers subdued Peavy, put him in handcuffs, and placed him on the floor. Nurse Pendarvis administered a five milligram dose of Haldol. The stapled lacerations on his head were bleeding. Therefore, Pendarvis applied gauze and tape. She then instructed the guards to monitor Peavy closely while she contacted MGH. After speaking with Dr. Stevens, Pendarvis ordered that Peavy be transported back to Marion General Hospital for treatment and evaluation.

Peavy was admitted to MGH at 5:24 in the evening. Dr. Stevens examined him, noting that he had split open his previous laceration and caused a new one. Peavy again claimed that voices commanded him to hit his head against the wall. Stevens noted that Peavy's mental symptoms persisted, despite extra doses of anti-psychotics. Hospital staff cleaned Peavy's wounds, applied bandages, and discharged him.

While Peavy was at MGH, Nurse Pendarvis contacted Sergeant Chris Cochran, a Defendant in this matter, and instructed him to monitor Peavy closely. She specifically instructed him to check

on Peavy every fifteen minutes and attempt to elicit a response from him. She also told him to contact the nurse on duty if Peavy showed any signs of agitation.

At approximately 7:50 p.m., several officers, including Jailor David Rester and Sergeant Chris Cochran, Defendants in this matter, returned Peavy to his cell and placed hobble restraints on him, by the order of Defendant Derrick Mingo. "Hobbling" may also be referred to as "hog tying"or a "four point restraint" – a method of restraint in which the detainee's hands and feet are bound together behind his back. A detainee restrained in such a manner can not stand or even sit upright. Accordingly, the officers placed Peavy on his side on a mattress in the floor of his cell.

At approximately 8:59 p.m., Rester observed that Peavy had rolled over on top of his restraints and was banging the back of his head on the floor. Rester went to Peavy's cell, placed him back on his side on the mattress, and advised Sergeant Cochran of what had occurred. Rester testified that Peavy continued to periodically work his way off the mattress and onto the floor – where he would bang his head on the floor – throughout the next hour or so. Each time, Rester placed Peavy back on the mat and attempted to calm him.

At 9:30 p.m., Rester told Cochran that Peavy had dislodged two of the staples from his head. A few officers, including Defendants Rester and Cochran, returned Peavy to his mat once again. Upon Mingo's order, Cochran called Nurse Pendarvis around 9:45.

Nurse Pendarvis arrived at MWCF at approximately 10:15. Peavy had a one centimeter cut on his right pinkie finger, abrasions on his right elbow, and abrasions on his left ankle – all of which she cleaned and bandaged. Two staples in his head had loosened due to him banging his head on the floor. Pendarvis applied gauze and tape to the stapled wounds and administered a five milligram dose of Haldol. Peavy was cooperative and quiet throughout the examination and treatment.

5

Pendarvis advised the officers to encourage Peavy to drink some water during the night and to monitor him closely. The officers returned him to his cell in the hobble restraints. Nurse Pendarvis left the facility at approximately 11:35 p.m., and Rester observed Peavy beat his head on the floor at least one more time after she left – at approximately 12:52 a.m., on February 10, 2009.

Throughout Peavy's struggles, he managed to substantially loosen the hobble restraints. He was able to stretch his legs out, but he could not stand and walk. At some point between 12:52 a.m. and 1:29 a.m., Defendant Rester observed that Peavy had loosened the restraints, and he went to the cell to check on him. Rester testified that he spoke with Peavy, and that Peavy was calm. Rester then contacted Sergeant Cochran and advised him that the restraints were loose, but that Peavy was not struggling. Peavy was relaxed. Accordingly, Cochran called Major Mingo and asked if they could remove the restraints because Peavy was calm and, in the event that he became agitated once again, he could use the loosened restraints to harm himself. Mingo said that they could remove the restraints, but he advised that if Peavy started to show signs of aggressiveness, to put them back on him.

At approximately 1:55 a.m., on February 10, 2009, an officer observed Peavy staggering around his cell. Rester observed Peavy in the closed circuit camera monitor, and immediately thereafter Peavy ran head first into the door. Rester, Cochran, and another officer ran to Peavy's cell. Cochran testified that they heard a loud banging noise come from the cell as they were on their way to it. An officer who is not a party to this matter recorded in his incident report that Peavy rammed the door frame with his head, fell to the floor, got up, and started running toward them after they had the door to the cell open. Therefore, it is unclear how many times Peavy ran head first into the door or door frame before he was restrained.

Once they were in the cell, the officers grabbed Peavy and placed him on the floor. Peavy struggled and attempted to bite and kick the officers. Sergeant Cochran told Rester to put the hobble restraints back on him. As Rester put the restraints on Peavy, Cochran and another officer noticed that Peavy was no longer breathing. Therefore, Cochran told Rester to stop.

Sergeant Cochran called a Code Blue at approximately 2:01 a.m., and an ambulance was called. One of the officers on the scene administered CPR. By approximately 2:29 a.m., Peavy was en route to MGH. At 2:54 a.m., Peavy was pronounced dead. According to Peavy's autopsy report, he died from blunt force injuries to the head.

Plaintiff filed the present action on May 4, 2010, asserting wrongful death and survival claims against Marion County, Mississippi, and various officers in their individual and official capacities for alleged violations of Peavy's constitutional rights. The individual Defendants filed their Motion for Qualified Immunity [20] on August 10, 2010.

### B.      Policies and Procedures of MWCF

#### 1.      Suicidal Detainees

MWCF's suicide prevention policy provides that officers should "always be on alert for the possibility of a suicide attempt." It also provides that officers "should make every reasonable patrol throughout cell blocks within the facility and check every inmate." In the event of an attempted suicide, officers are to immediately contact certain administrative officials, including Sheriff Hall, Warden Abrams, and Major Mingo. Finally, the policy further provides: "When the deputy has become aware that an inmate has made a threat or that an inmate has a prior suicide attempt or that the inmate displays behavior or physical suicide warning signs . . . the jail staff shall institute a 'suicide watch' on the inmate and document every fifteen minutes."

7

In addition to the suicide prevention policy, MWCF utilized a series of training materials titled "Command & Control." Specifically, MWCF used a workbook titled "Suicide Prevention: A Proactive Solution." The workbook provides that suicidal inmates should be physically observed by staff on a continuous, uninterrupted basis, and that officers should not rely on audio or closed circuit video monitors.

When asked about the policy regarding suicidal detainees, Warden Abrams initially described the "suicide watch" policy described above, which required physical observation at fifteen-minute intervals and constant monitoring through cameras. He was unfamiliar with the specific "Command & Control" document at issue in this case, but he testified that he had seen materials from that series of workbooks during training. After he read the workbook at the request of counsel, he testified that the workbook was part of the official policies of MWCF

Major Mingo testified that the "Command & Control" document merely contributed to the facility's official policies, rather than determining them. Defendants Cochran, McElroy, Speights, and Rester were not familiar with the "Command & Control" workbook. Sheriff Hall testified that the policy was to place suicidal detainees on "suicide watch" – the aforementioned policy of physical observation every fifteen minutes coupled with continuous monitoring through cameras.

2.      *Use of Restraints*

MWCF's policy regarding the use of restraints provides that restraint equipment should only be used at the discretion of the Warden or certain supervisors. In the event that restraints are used, officers are required to use only the amount of force necessary to restrain the individual. Detainees who are cuffed and shackled are to be turned on their side and continuously watched, rather than left unsupervised. Restraints are never to be applied as punishment.

MWCF also has a policy specifically addressing the use of four-point restraints – or hobble restraints. Before four-point restraints may be used, advance approval must be given by the Warden or his designee, and the designated health authority or her designee. Until the health authority approves the use of four-point restraints, the staff must continuously observe the detainee to be restrained. After the detainee is restrained, the staff must physically observe him every fifteen minutes.

## II. STANDARD OF REVIEW

"[T]he legally relevant factors bearing upon the [qualified immunity] question will be different on summary judgment than on an earlier motion to dismiss." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996)). At the motion to dismiss stage, the Court accepts the allegations of the complaint as true, but at the summary judgment stage, the Court examines the record evidence in the light most favorable to the plaintiff. *Id.* In the present case, both parties have presented evidence, which the Court shall consider. Therefore, the Court must apply the summary judgment standard cited above. *Collins v. Ainsworth*, 382 F.3d 529, 536 (5th Cir. 2004).

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). "Where the burden of production at trial ultimately rests on the nonmovant, 'the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case.'" *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (quoting *Shields v. Twiss*, 389 F.3d 142, 149 (5th Cir. 2004)). The nonmovant "must come forward

with specific facts showing that there is a genuine issue for trial." *Id.* (punctuation omitted). "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc.*, 627 F.3d at 138 (quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra*, 626 F.3d at 812 (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)).

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). When deciding whether a genuine fact issue exists, "the court must view the facts and the inference to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138 (quoting *Daniels*, 246 F.3d at 502). However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005)). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon*, 305 F.3d at 323 (citing *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001)); *see also Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010). The Fifth Circuit Court of Appeals noted:

> Where, as here, a section 1983 defendant pleads qualified immunity and shows he is a government official whose position involves the exercise of discretion, the plaintiff then has the burden to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law. We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.

10

*Kovacic*, 628 F.3d at 211 (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 456 (5th Cir. 2001) (punctuation and internal citations omitted).

### III. QUALIFIED IMMUNITY

The Court conducts a two-pronged analysis in deciding whether a defendant is entitled to qualified immunity. *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007). In the first prong of the analysis, the Court determines "whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights." *Id.* at 410 (citing *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005); *McClendon*, 305 F.3d at 322-23; *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001)). In the second prong, the Court considers "whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id.* at 411 (citing *Tarver*, 410 F.3d at 750; *Glenn*, 242 F.3d at 312). The Court "applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Id.* (citing *Glenn*, 242 F.3d at 312; *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000); *Tarver*, 410 F.3d at 750). The Court may examine the prongs of the analysis in whatever order it chooses. *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).

A.     *Eighth Amendment*

Plaintiff alleges that Defendants' actions constituted a violation of his Eighth Amendment right to be free from cruel and unusual punishment. However, "[t]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose

punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process

Clause of the Fourteenth Amendment." *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S. Ct. 1861, 60

L. Ed. 2d 447 (1979) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40, 97 S. Ct. 1401, 51 L.

ed. 2d 711 (1977)). Therefore, as Peavy was detained pending a commitment hearing and had not

been convicted of any crime at the time of his detention, the Eighth Amendment is inapplicable to

this case. *See Anderson v. Perkins*, 532 F. Supp. 2d 837, 842 (S.D. Miss. 2007) (citing multiple

cases). Accordingly, Plaintiff has failed to show that the individual Defendants violated Peavy's

Eighth Amendment rights, and the Court grants their motion for qualified immunity with respect to

any Eighth Amendment claim asserted by Plaintiff.

**B.      Fourteenth Amendment**

> The Fifth Circuit Court of Appeals has observed:

> Unlike convicted prisoners, whose rights to constitutional essentials like medical
> care and safety are guaranteed by the Eighth Amendment, pretrial detainees look to
> the procedural and substantive due process guarantees of the Fourteenth Amendment
> to ensure provision of these same basic needs. A pretrial detainee's due process
> rights are at least as great as the Eighth Amendment protections available to a
> convicted prisoner. . . . [T]he State owes the same duty under the Due Process Clause
> and the Eighth Amendment to provide both pretrial detainees and convicted inmates
> with basic human needs, including medical care and protection from harm, during
> their confinement.

*Jacobs v. W. Feliciana Sheriff's Dept.*, 228 F.3d 388, 393 (5th Cir. 2000) (citations and punctuation

omitted).[3] Therefore, "persons detained awaiting civil commitment due to mental illness have a

clearly established constitutional right to . . . be protected from self-harm . . . ." *Anderson*, 532 F.

---

[3]This Court has previously held that one held prior to a civil commitment hearing enjoys
at least the same constitutional protections as one held prior to a criminal trial. *Anderson*, 532 F.
Supp. 2d at 842; *see also Boston v. Lafayette Cnty., Miss.*, 743 F. Supp. 462, 473-74 (N.D. Miss.
1990).

Supp. 2d at 842 (citing *Partridge v. Two Unknown Police Officers*, 791 F.2d 1182, 1187 (5th Cir. 1986)); *see also Flores v. Cnty. of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997) (detainee's right to adequate protection from known suicidal tendencies is clearly established).

Prison or jail officials must adequately protect such detainees from known suicidal tendencies. *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996). Officials violated a detainee's constitutional rights if "they had actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Id.* "Deliberate indifference is more than mere negligence or even gross negligence." *Brown*, 623 F.3d at 255 (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). "Deliberate indifference, as defined in due process cases, requires both that the government official have 'subjective knowledge of a substantial risk of serious harm to a pretrial detainee' and that the government official respond with 'deliberate indifference to that risk.'" *United States v. Gonzalez*, 436 F.3d 560, 573 (5th Cir. 2006) (quoting *Hare II*, 74 F.3d at 650).

"Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Brown*, 623 F.3d at 255 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). "Deliberate indifference implies an official's actual knowledge of facts showing that a risk of serious harm exists as well as the official's having actually drawn that inference." *Id.* (citing *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998)). "Proof of deliberate indifference normally requires a plaintiff to show a pattern of violations" and that the violation was "obvious and obviously likely to result in a constitutional violation." *Id.* (citing *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381-82 (5th Cir. 2005)).

1.     *Official Policies and Procedures*

First, the Court must address a threshold issue that is central to Plaintiff's claims. Plaintiff argues that there is a genuine issue of disputed material fact as to the official policy at MWCF regarding the observation of suicidal detainees. The suicide prevention policy requires physical observation every fifteen minutes and continuous observation through video cameras, whereas the "Command & Control" workbook – which Warden Abrams' testified was part of the facility's official policy – requires continuous physical observation. Plaintiff contends that the individual Defendants are not entitled to qualified immunity if a dispute exists as to the official policy, as it is undisputed that they did not follow the guidelines contained in the "Command & Control" workbook.

Succinctly put, no genuine factual dispute exists on this issue. The record is clear that the facility's practice was consistent: constant monitoring through closed circuit cameras and fifteen-minute physical observations. Warden Abrams was unfamiliar with the "Command & Control" workbook prior to his deposition, but he described the same "suicide watch" policy that every other individual Defendant described. Interpreting the facts in the light most favorable to Plaintiff, the Court can not find any legitimate issue of fact with regard to the official policy of MWCF regarding the observation of suicidal detainees. Regardless of whether the "Command & Control" workbook was considered part of the "official" policy, there is no dispute that the facility's consistent practice comported with the suicide prevention policy: constant monitoring through closed circuit television and physical observation every fifteen minutes.

More importantly, even if there were a genuine factual dispute on this issue, it would not necessarily be material. Whether the "Command & Control" document was considered the "official"

14

policy of MWCF is less important to the resolution of this motion than whether the specific actions of each individual Defendant constituted deliberate indifference to a substantial risk of serious harm to Peavy. *Gonzalez*, 436 F.3d at 573 (quoting *Hare*, 74 F.3d at 650). Plaintiff wrongly assumes that the failure to comply with a policy constitutes deliberate indifference per se. Even if one of the individual Defendants did not follow an official policy or custom, Plaintiff must show that the policy or procedure which he failed to follow was "obviously necessary in light of" the circumstances. *Hagan v. Houston Indep. Sch. Dist.*, 51 F.3d 48, 53 (5th Cir. 1995). Therefore, the pertinent question is not whether the Defendants complied with the "Command & Control" workbook's guidelines, but, rather, it is whether their failure to do so constituted deliberate indifference.

2.      *Sheriff Berkley Hall*

Plaintiff initially argues that Sheriff Hall violated Peavy's constitutional rights by approving the fifteen-minute physical inspection procedure for suicidal detainees, rather than requiring constant physical observation of suicidal detainees. A policy-making official's failure to adopt a particular precaution, policy, or procedure "must amount to an intentional choice, not merely an unintentionally negligent oversight" in order to provide a basis for Section 1983 liability. *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992); *see also Brown*, 623 F.3d at 257 (5th Cir. 2010). The official's failure to institute a different policy or procedure must "amount to subjective deliberate indifference." *Brown*, 623 F.3d at 257. "It must be 'obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Id.* (quoting *Rhyne*, 973 F.2d at 392).

Plaintiff has failed to show that Sheriff Hall's approval of physical inspections every fifteen-minutes and constant monitoring through closed circuit television constitutes deliberate indifference. According to the evidence, Sheriff Hall "was not indifferent in the literal sense of the word to the

known risk of suicide," as MWCF provided greater observation for suicidal detainees than it did for other detainees. *Rhyne*, 973 F.2d at 393. Indeed, the record shows that Sheriff Hall ordered Peavy's transfer to MWCF for the express purpose of providing greater supervision. "This effort indicates not apathy, but concern." *Id.* (citing *Rellergert v. Cape Girardeau Cnty., Mo.*, 924 F.2d 794, 797 (8th Cir. 1991)).

While Plaintiff may have presented evidence which would allow a jury to conclude that Sheriff Hall was negligent or that the periodic physical inspections were inadequate, that is insufficient to defeat qualified immunity. *Id.* Plaintiff produced no evidence of other suicide attempts at MWCF that would have provided notice that more frequent or constant physical observation was objectively necessary. In fact, Sheriff Hall testified that there had been no other suicide attempts at MWCF during his tenure as Sheriff.

Plaintiff relies on the fact that the facility's official policy and procedures did not comport with the "Command & Control" training materials, but for that fact to be relevant, Plaintiff must first show that the policy *should* have comported with the "Command & Control" materials. "The difference between frequent periodic checks and 'continuous observation' is one of degree. Without evidence showing that the higher level of care was obviously necessary," the Court can not conclude that the "lower level of surveillance was deliberately indifferent." *Id.*[4]

---

[4]Plaintiff has submitted a preliminary report from his expert in this matter, Charles A. Lindquist, who offers the opinion that suicidal detainees should be placed under continuous direct, physical observation. He cited several purported standards for detention facilities, but the record does not contain any copies of such standards. Indeed, the Court has little information as to the source of these alleged standards or the extent to which they are observed among criminal justice professionals. In any case, the Court is not convinced that Lindquist's opinion is sufficient to bear Plaintiff's burden in overcoming qualified immunity, as it does not provide any evidence that Sheriff Hall should have known Peavy's suicide was obviously likely in the absence of more frequent or constant physical observation.

Plaintiff further argues that Hall failed to properly instruct his staff on the procedures outlined in the "Command and Control" workbook, which required continuous physical observation of Peavy. "A supervisor may be held liable under § 1983 for failure to train or supervise subordinates if (1) the supervisor failed to train or supervise; (2) a causal link exists between the failure and violation of plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Brown*, 623 F.3d at 254 n. 1 (citing *Estate of Davis*, 406 F.3d at 381). Assuming that Plaintiff has proven the first two prongs of this analysis, the Court concludes that Plaintiff has failed to prove that Sheriff Hall's purported failure to train amounted to deliberate indifference. As the Court noted above, Plaintiff failed to prove that the failure to employ continuous physical observation constituted deliberate indifference. If Hall's failure to institute a continuous physical observation policy does not constitute deliberate indifference, then his failure to train staff to employ such a policy can not either.

Finally, Plaintiff argues that Hall failed to communicate with Defendants Abrams and Mingo during Peavy's detention, which Plaintiff contends led to a breakdown in the communication process at MWCF. Plaintiff did not identify what Hall should have communicated, or how said failure to communicate constituted deliberate indifference. The Court will evaluate this argument under the framework applied to general failure-to-supervise claims. Assuming that Plaintiff has proven the first prong of the test, the Court finds that Plaintiff failed to offer any evidence whatsoever regarding a causal link between the failure to communicate and the alleged violation of Peavy's rights.

To the extent that Plaintiff has alleged any claims against Defendant Hall in his individual capacity under a theory of respondeat superior, such claims are not tenable, as he can only be held liable for his own unconstitutional conduct. *Brown*, 623 F.3d at 253 (citing *Harris*, 489 U.S. at 385,

109 S. Ct. 1197).

For all the reasons stated above, the Court grants Defendants' Motion for Qualified Immunity with respect to Defendant Berkley Hall.

3.    *Warden Chuck Abrams*

Plaintiff argues that Warden Abrams violated Peavy's constitutional rights by failing to order an increased level of observation after Peavy's first suicide attempt. As the Court has already noted, Plaintiff has not presented any evidence to support his argument that a higher level of observation was obviously necessary to prevent harm. Therefore, Abrams' failure to order continuous physical observation does not constitute deliberate indifference. *Rhyne*, 973 F.2d at 393.

Next Plaintiff argues that Abrams violated Peavy's constitutional rights by failing to order the use of restraints after Peavy's first suicide attempt.[5] Abrams testified that he and Major Mingo discussed using restraints on Peavy after his first suicide attempt, but they ultimately decided that there was no threat of additional self-harm, as Peavy was "very docile." Mingo testified that he assumed that there would be no problems because of the medication administered at the hospital. Hospital records confirm that Peavy was given a dose of Risperdal at MGH, and Nurse Pendarvis's notes indicate that Peavy was calm when he returned to MWCF from the hospital. Pendarvis intended to give Peavy a dose of Haldol later in the afternoon. Therefore, according to the undisputed evidence in the record, it was not obviously likely at the time that Abrams' failure to order the use of restraints after Peavy's first suicide attempt would result in harm. Peavy was sedated, and the evidence indicates that he was calm.

---

[5]To be clear, Peavy's first suicide attempt at MWCF was at approximately 10:29 a.m. on February 9, 2009. After the attempt, he was transported to MGH – his *second* trip to the hospital.

Plaintiff also argues that Abrams failed to remain involved in decisions regarding Peavy's detention after the first suicide attempt. Specifically, Plaintiff contends that Abrams failed to ensure that the facility's policy regarding the notification of authorities was followed after the first suicide attempt,[6] and that Abrams failed to ensure that his staff properly communicated with one another about Peavy during shift changes. The Court interprets these allegations as variations of a failure-to-supervise claim. "A supervisor may be held liable under § 1983 for failure to train or supervise subordinates if (1) the supervisor failed to train or supervise; (2) a causal link exists between the failure and violation of plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Brown*, 623 F.3d at 254 n. 1 (citing *Estate of Davis*, 406 F.3d at 381).

First, Plaintiff has not proven that Abrams failed to ensure that the facility's staff properly communicated with one another. Defendant Jeremy McElroy – one of the jailors on duty during the day shift, when Peavy's first two attempts occurred – testified that before he began his shift that morning, his supervisor, Defendant Stephen Speights, advised him that they had a detainee in the suicide cell who needed to be monitored on medical watch. Additionally, Defendant Speights – the sergeant on the day shift – testified that he told Defendant Cochran – the sergeant on duty the night of Peavy's death – about the two previous suicide attempts. Defendant David Rester, a jailor on duty the night of Peavy's death, testified that Cochran told him that Peavy had been ramming his head into the wall and door, that he would be held in the suicide cell, and that he would be placed in hobble restraints. Cochran testified that he learned this from Speights. Therefore, the Court finds that

---

[6]The suicide prevention policy and procedures provide that "[i]n the event of an attempted suicide in the Marion County Jail, the Warden, Chief of Security, Sheriff, Chief Investigator, and MDOC Commissioner should be called immediately." The procedures also require that the District Attorney or his investigator, the Mississippi Highway Patrol Criminal Investigation Bureau, and the FBI be contacted.

Plaintiff has failed to prove that there was, in fact, any failure to communicate among the jail's staff.

With respect to Plaintiff's allegation that Abrams failed to ensure that proper parties were notified as required by the suicide prevention policies and procedures, the Court finds that Plaintiff has not presented any evidence that contacting those parties was "obviously necessary in light of" the circumstances. *Hagan*, 51 F.3d at 53.

To the extent that Plaintiff has alleged any claims against Defendant Abrams in his individual capacity under a theory of respondeat superior, such claims are not tenable, as he can only be held liable for his own unconstitutional conduct. *Brown*, 623 F.3d at 253 (citing *Harris*, 489 U.S. at 385, 109 S. Ct. 1197).

For all the reasons stated above, the Court grants the individual Defendants' Motion for Qualified Immunity as to Defendant Chuck Abrams.

### 4.     *Major Derrick Mingo*

Plaintiff argues that Mingo violated Peavy's constitutional rights by failing to order increased observation. The Court rejects this argument for the same reasons stated above.

Plaintiff also argues that Mingo violated Peavy's constitutional rights by failing to place restraints on Peavy after his first suicide attempt. The Court rejects this argument for the same reasons stated above.

Plaintiff further argues that Major Mingo violated Peavy's constitutional rights by failing to seek out sufficient knowledge of his history, but Plaintiff failed to identify what information Mingo should have sought or how it would have prevented Peavy from harming himself. The deliberate indifference standard requires that Plaintiff prove Mingo had actual knowledge of facts showing a substantial risk of serious harm to Peavy in the event he failed to obtain this unspecified

information. *Id.* at 255; *see also Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006) (officer had

no knowledge of prisoner's history as an informant, and therefore qualified immunity applied).

Then, Plaintiff must also show that Mingo actually drew the inference that he needed more

information, yet displayed deliberate indifference to the substantial risk of serious harm. *Brown*, 623

F.3d at 255.

It is impossible to evaluate whether Mingo should have sought out the information to which

Plaintiff refers – or whether his possession of it would have prevented Peavy's suicide – without

knowing what that information is. Plaintiff has not identified which of Mingo's actions, if any,

would have necessarily been different if he had been in possession of this unspecified information.

Accordingly, the Court holds that Plaintiff has failed to offer sufficient evidence to defeat qualified

immunity on this issue.

Next, Plaintiff argues that Mingo violated Peavy's constitutional rights by failing to consult

with the "mental health crisis center," but Plaintiff has failed to offer any evidence whatsoever as

to what such a call would have accomplished. Each time Peavy attempted to harm himself, he was

examined by a nurse and taken to the hospital. After his first suicide attempt, Nurse Pendarvis

contacted Pine Belt Mental Health, but Peavy's doctor was not present. She requested that they

contact MGH – where Peavy had just been taken – to provide further information. There is also

evidence that Mingo himself ordered Sergeant Cochran to call the nurse to examine Peavy when he

showed signs of agitation during the period of time between Peavy's second suicide attempt and his

death. Therefore, to the extent that Plaintiff claims Mingo, as the Chief of Security, was deliberately

indifferent to the need to consult with medical personnel concerning Peavy's condition, the record

is clear that medical personnel were involved throughout the events leading up to Peavy's death.

21

Nurse Pendarvis attempted to contact a mental health professional familiar with Peavy, and Mingo himself ordered that staff contact the nurse after hours to examine Peavy. Accordingly, the Court rejects this argument.

Finally, Plaintiff contends that Mingo violated Peavy's constitutional rights by leaving the decision as to whether to remove his restraints to a subordinate with limited knowledge of Peavy's history – Sergeant Cochran. In order to defeat qualified immunity, Plaintiff must prove that Mingo knew that leaving the decision to Cochran would place Peavy in substantial risk of serious harm, and that Mingo was deliberately indifferent to that risk. *Id.* The evidence in the record does not support such a finding. Cochran was aware that Peavy had returned from the hospital, that he had been placed in hobble restraints, and that he was on suicide watch. Cochran was on duty and able to observe Peavy's behavior, and Cochran told Mingo that Peavy was calm, having been sedated by the nurse. Cochran also told Mingo that the restraints were loose enough that Peavy could potentially use them to harm himself. Mingo expressly warned Cochran to put the hobble restraints back on Peavy if he showed any signs of aggressiveness.

Initially, the Court holds that Plaintiff failed to show that Cochran's knowledge of Peavy's history was "limited" to the degree that it necessarily placed Peavy at a substantial risk of serious harm. Cochran knew Peavy was a suicide risk, and he knew Peavy had already been to the hospital at least once that day. The Court also holds that Plaintiff has failed to show that Mingo exhibited deliberate indifference to a substantial risk of serious harm by leaving the decision to Cochran. Mingo was not on duty, and Cochran was at the facility, able to observe Peavy and gauge his condition. Cochran told Mingo that the nurse had sedated Peavy, and that he was now calm. Therefore, in light of the information available to Mingo at the time, the Court can not find that

allowing Cochran to make a judgment call as to the restraints constituted deliberate indifference.

To the extent that Plaintiff has alleged any claims against Defendant Mingo in his individual capacity under a theory of respondeat superior, such claims are not tenable, as he can only be held liable for his own unconstitutional conduct. *Id.* at 253 (citing *Harris*, 489 U.S. at 385, 109 S. Ct. 1197).

For the reasons stated above, the Court grants Defendants' Motion for Qualified Immunity as to Defendant Derrick Mingo.

    5.    *Sergeant Chris Cochran*

First, Plaintiff argues that Cochran's lack of familiarity with the "Command & Control" workbook led to the violation of Peavy's constitutional rights. As the Court has already held that the failure to utilize the continuous physical observation policy of the "Command & Control" workbook does not constitute a constitutional violation, Cochran's failure to familiarize himself with the workbook is of little consequence. Plaintiff failed to show that "the higher level of care was obviously necessary." *Rhyne*, 973 F.2d at 393. Therefore, Plaintiff has failed to show that Cochran's failure to familiarize himself with the document requiring the higher level of observation was obviously necessary.

Next, Plaintiff argues that Cochran failed to seek information regarding how many times Peavy had been hospitalized prior to his shift. Indeed, Cochran testified that he did not recall being told how many times Peavy had been to the hospital. However, the record is clear that Cochran knew Peavy had been to the hospital at least once for an attempted suicide. The record is also clear that Cochran knew Peavy was on suicide watch and that he had been placed in hobble restraints. Plaintiff has not offered any evidence which would indicate that Cochran would have acted any differently

23

had he known of Peavy's two other hospital visits (only one of which was for a suicide attempt). Therefore, Plaintiff has not proven that Cochran's failure to seek this information caused any harm to Peavy. Furthermore, Plaintiff has not presented any evidence which would indicate that Cochran knew he should seek out additional information concerning Peavy. At best, the facts show mere negligence on Cochran's part, rather than deliberate indifference.

Next, Plaintiff argues that Cochran violated Peavy's rights by characterizing him as "relaxed" in a telephone conversation with Mingo, which directly led to the removal of the hobble restraints. There is no evidence in the record to contradict Cochran's testimony that – at that point in time – Peavy was relaxed. Indeed, Nurse Pendarvis wrote that Peavy was cooperative and quiet. Therefore, this argument has no merit.

Finally, Plaintiff argues that Cochran violated Peavy's constitutional rights by removing the hobble restraints, but, as the Court previously noted, Cochran's decision to remove the restraints was motivated by a desire to prevent Peavy from using them to harm himself. Therefore, Cochran was not deliberately indifferent to the threat of self-harm. At best, he made an error in judgment.

For all the reasons stated above, the Court grants Defendants' Motion for Qualified Immunity as to Defendant Chris Cochran.

6.    *Jailor Jeremy McElroy*

Plaintiff first argues that McElroy violated Peavy's constitutional rights by failing to review the "Command & Control" workbook. The Court rejects this argument for the reasons previously stated.

Plaintiff also argues that McElroy violated Pevay's constitutional rights by failing to provide continuous physical observation. The Court rejects this argument for the reasons previously stated.

Next, Plaintiff argues that McElroy failed to contact the District Attorney, the Mississippi Highway Patrol Criminal Investigation Bureau, the FBI, and the MDOC Commissioner as required by MWCF's policies and procedures. As the Court previously noted, Plaintiff failed to offer any evidence that contacting those parties was "obviously necessary in light of" the circumstances, and the failure to follow a policy or procedure does not constitute deliberate indifference per se. *Hagan*, 51 F.3d at 53. Therefore, the Court rejects this argument.

Finally, Plaintiff argues that McElroy failed to communicate with his staff sergeant or the Warden regarding the levels of observation and restraints to be utilized after Peavy's first suicide attempt. However, McElroy testified that Sergeant Speights advised him when he came on shift that Peavy was in the suicide cell, and that he needed to be monitored on "suicide watch." When McElroy responded to Peavy's first suicide attempt, Sergeant Speights was with him. When McElroy sounded a "Code Blue" upon discovering Peavy after the first suicide attempt, several parties responded, including Warden Abrams. Therefore, it is unclear what information Plaintiff suggests McElroy should have given to his superiors, as at least one of them was with him during each significant event.

Plaintiff may intend to argue that McElroy should have suggested to his supervisors that an increased level of observation be used or hobble restraints be applied after the first suicide attempt. First, the Court questions whether it is appropriate to place the onus of making such judgment calls on a subordinate, rather than the supervisor, as this argument effectively does. Regardless, the Court already held that Plaintiff has produced no evidence that an increased level of observation was obviously necessary to prevent a substantial risk of serious harm. Therefore, McElroy's failure to communicate with his superiors regarding an increased level of observation is of no consequence.

25

As for the use of restraints, Peavy had a "calm manner" when he returned from the hospital after his first suicide attempt, according to Nurse Pendarvis's notes. The physician at MGH had administered a dose of Risperdal. There is no evidence in the record suggesting that – at that time – the use of hobble restraints was obviously necessary to prevent a substantial risk of serious harm. Furthermore, it is undisputed that McElroy did not have the authority to order the use of restraints. Therefore, the Court can not find that he displayed deliberate indifference by not communicating with his supervisors regarding the use of restraints.

For all the reasons stated above, the Court grants Defendants' Motion for Qualified Immunity with respect to Defendant Jeremy McElroy.

7.   *Sergeant Stephen Speights*

Plaintiff argues that Speights' failure to review the "Command & Control" workbook constituted a violation of Peavy's constitutional rights. For the reasons previously stated, the Court rejects this argument.

Plaintiff also argues that Speights violated Peavy's constitutional rights by failing to provide continuous physical observation. The Court rejects this argument for the reasons previously stated.

Plaintiff additionally argues that Speights violated Peavy's constitutional rights by failing to contact the District Attorney, the Mississippi Highway Patrol Criminal Investigation Bureau, the FBI, and the MDOC Commissioner as required by MWCF's policies and procedures. The Court rejects this argument for the reasons previously stated.

Plaintiff also argues that Speights violated Peavy's constitutional rights by failing to consult with a "mental health crisis center," but Plaintiff failed to offer any evidence that such a consultation was obviously necessary to prevent a substantial risk of serious harm to Peavy. Nurse Pendarvis

26

contacted Pine Belt Mental Health, but Peavy's doctor was not present. She requested that they contact MGH – where Peavy had just been taken – to provide further information. Therefore, the Court rejects this argument.

Plaintiff further argues that Speights failed to communicate with Warden Abrams regarding the observation level and restraint options to be utilized when Peavy returned from the hospital after his first suicide attempt. The Court rejects this argument for the reasons previously stated.

Finally, Plaintiff contends that Speights failed to convey important information to the officers on the night shift regarding what had happened during the day shift. However, Speights testified that he told Sergeant Cochran about both suicide attempts. Likewise, Cochran testified that Speights told him that Peavy was at the hospital and was to be placed in the suicide cell upon his return. Therefore, this argument has no merit.

For the reasons stated above, the Court grants Defendants' Motion for Qualified Immunity with respect to Defendant Stephen Speights.

### 8.    *Jailor David Rester*

Plaintiff alleges that Rester's failure to review the "Command & Control" workbook constituted a violation of Peavy's constitutional rights. The Court rejects this arguments for the reasons previously stated.

Plaintiff also alleges that Rester did not try to obtain complete information about Peavy's detention and hospital visits, which caused a violation of Peavy's constitutional rights. It is undisputed that Rester knew Peavy was returning from the hospital after a suicide attempt, that he was going to be housed in the suicide cell, that he was going to be placed in hobble restraints, and that he was going to be observed on suicide watch. Plaintiff failed to provide any evidence that it

was obviously necessary for Rester to obtain any further information to prevent Peavy from harming himself. Plaintiff also failed to provide any evidence that Rester knew that he should obtain such information but was deliberately indifferent to it. Accordingly, the Court rejects this argument.

Finally, Plaintiff argues that Rester violated Peavy's rights by removing the hobble restraints. As the Court previously noted, Cochran testified that Peavy was relaxed, and Nurse Pendarvis wrote that Peavy was cooperative and quiet. Also, Sergeant Cochran decided to remove the restraints in order to prevent Peavy from using them to harm himself. Therefore, the removal of the hobble restraints did not constitute deliberate indifference to the danger of Peavy harming himself. Rather, it was in order to prevent him from doing so. At best, it was an error in judgment.

For the reasons stated above, the Court grants Defendant's Motion for Qualified Immunity as to Defendant David Rester.

### IV. CONCLUSION

Plaintiff argues that a wide variety of actions and inactions by the individual Defendants in this matter were constitutional violations. However, Plaintiff's arguments can be reduced to two core contentions: 1) that Defendants failed to monitor Peavy closely enough to prevent his suicide, and 2) that Defendants failed to restrain Peavy as they should. As the Court already noted, Plaintiff is required to show that the individual Defendants failed to follow a policy or procedure that was "obviously necessary in light of" the circumstances. *Hagan*, 51 F.3d at 53.

"The difference between frequent periodic checks and 'continuous observation' is one of degree. Without evidence showing that the higher level of care was obviously necessary," the Court can not conclude that the "lower level of surveillance was deliberately indifferent." *Rhyne*, 973 F.2d at 393. Indeed, the existence of a heightened observation protocol for suicidal detainees exhibits

concern, rather than deliberate indifference. *Id.* (citing *Rellergert*, 924 F.2d at 797). Plaintiff has simply failed to offer any evidence that continuous observation was obviously necessary in light of the facts known to each of the individual Defendants.

Similarly, Plaintiff has failed to offer any evidence that Defendants exhibited deliberate indifference by not placing Peavy in hobble restraints earlier or by removing the hobble restraints. When Peavy first arrived at MWCF, he was calm. He was also calm after his first and second suicide attempts. At best, the evidence shows that the Defendants exhibited poor judgment with respect to their estimations of the effectiveness of the sedatives administered by medical personnel. This is not sufficient to defeat qualified immunity.

While the actions and inactions of the individual Defendants in this matter may amount to negligence or even gross negligence, they do not rise to the level of deliberate indifference. Accordingly, the individual Defendants enjoy qualified immunity from suit. The Court grants Defendants' Motion for Qualified Immunity [20]. The Court lifts the stay on this matter and orders counsel for both parties to contact the Magistrate Judge within three (3) days of the entry of this order, for purposes of scheduling a Case Management Conference.

SO ORDERED AND ADJUDGED this 12th day of April, 2011.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE

29